IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD A. LONDON,

        Plaintiff,                   No. CIV S-04-0067 GEB GGH P

    vs.

EDWARD S. ALAMEIDA, et al.,

        Defendants.           FINDINGS & RECOMMENDATIONS

_____/

I.  Introduction

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court are motions for summary judgment filed by defendant Dr. Sogge on April 5, 2006, and by defendants Dr. Williams, Nurse Williams and Dr. Douglas on April 28, 2006.

        This action is proceeding on the amended complaint filed January 13, 2004. Plaintiff alleges that defendants provided him with inadequate medical care for hepatitis C in violation of the Eighth Amendment.  Because plaintiff's claims against all defendants concern their treatment of his hepatitis C, the court will address both motions in one section below.

        Plaintiff also alleges that he was denied medical care in retaliation for filing administrative grievances.  Plaintiff's amended complaint also suggests a claim for failure to

1

1   process administrative appeals in violation of the right to due process.

2         Defendants move for summary judgment only as to plaintiff's Eighth Amendment

3   claim.  After carefully reviewing the record, the court recommends that defendants be granted

4   summary judgment.  Because plaintiff has had an adequate opportunity to ventilate his retaliation

5   and due process claims, and because these claims are intertwined with the Eighth Amendment

6   claims, the court sua sponte recommends that defendants be granted summary judgment as to

7   these claims as well.  See Cool Fuel, Inc. v. Connett, 685 F.3d 309 (9th Cir. 1982).

8   II.  Summary Judgment Standards Under Rule 56

9         Summary judgment is appropriate when it is demonstrated that there exists "no

10  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

11  matter of law."  Fed. R. Civ. P. 56(c).

12        Under summary judgment practice, the moving party

13      always bears the initial responsibility of informing the district court
    of the basis for its motion, and identifying those portions of "the
14      pleadings, depositions, answers to interrogatories, and admissions
    on file, together with the affidavits, if any," which it believes
15      demonstrate the absence of a genuine issue of material fact.

16  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

17  P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

18  issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

19  depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

20  should be entered, after adequate time for discovery and upon motion, against a party who fails to

21  make a showing sufficient to establish the existence of an element essential to that party's case,

22  and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

23  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

24  necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

25  should be granted, "so long as whatever is before the district court demonstrates that the standard

26  for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

1    2553.

2            If the moving party meets its initial responsibility, the burden then shifts to the

3    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

4    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

5    (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

6    not rely upon the allegations or denials of its pleadings but is required to tender evidence of

7    specific facts in the form of affidavits, and/or admissible discovery material, in support of its

8    contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

9    106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

10   material, i.e., a fact that might affect the outcome of the suit under the governing law, see

11   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

12   Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

13   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

14   nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

15           In the endeavor to establish the existence of a factual dispute, the opposing party

16   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

17   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

19   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

20   genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

21   56(e) advisory committee's note on 1963 amendments).

22           In resolving the summary judgment motion, the court examines the pleadings,

23   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

24   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

25   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

26   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On April 30, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

III.  Discussion

Plaintiff's claims against all defendants concern their refusal to treat him with pegylated interferon or pegylated interferon combined with ribavarin.  Plaintiff also alleges that in 2003 defendant Nurse Williams made a false entry in his medical records that his drug abuse screen was positive, thereby precluding plaintiff from further interferon treatment.

A.  Eighth Amendment

*Legal Standard*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

1    A serious medical need exists if the failure to treat a prisoner's condition could

2  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

3  that a prisoner has a serious need for medical treatment are the following:  the existence of an

4  injury that a reasonable doctor or patient would find important and worthy of comment or

5  treatment; the presence of a medical condition that significantly affects an individual's daily

6  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

7  F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

8  (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

9  grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

10    In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

11  defined a very strict standard which a plaintiff must meet in order to establish "deliberate

12  indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

13  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

14  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

15  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

16  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

17    It is nothing less than recklessness in the criminal sense—a subjective standard—

18  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

19  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

20  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

21  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

22  of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

23  847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

24  knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

25  obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

26  1981.  However, obviousness per se will not impart knowledge as a matter of law.

1    Also significant to the analysis is the well established principle that mere

2    differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

3    Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

4    662 F.2d 1337, 1344 (9th Cir. 1981).

5    Moreover, a physician need not fail to treat an inmate altogether in order to violate

6    that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

7    1989).  A failure to competently treat a serious medical condition, even if some treatment is

8    prescribed, may constitute deliberate indifference in a particular case.  Id.

9    Additionally, mere delay in medical treatment without more is insufficient to state

10   a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

11   F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

12   no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

13   Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

14   1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

15   to provide additional support for a claim of deliberate indifference; however, it does not end the

16   inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

17   medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

18   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

19   the defendant."  McGuckin, 974 F.2d at 1061.

20   Superimposed on these Eighth Amendment standards is the fact that in cases

21   involving complex medical issues where plaintiff contests the type of treatment he received,

22   expert opinion will almost always be necessary to establish the necessary level of deliberate

23   indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

24   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

25   treatment he received equated with deliberate indifference thereby creating a material issue of

26   fact, summary judgment should be entered for defendants.  The dispositive question on this

summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

*Undisputed Facts*

During the times relevant to the complaint, defendant Soggge independently contracted with the California Department of Corrections and Rehabilitation (CDCR) to provide gastroenterology consultations and services to corrections inmates such as plaintiff.  As part of his contractual duties, defendant Sogge provided gastroenterology care and treatment to plaintiff from November 29, 1999, to April 22, 2002.

Defendant Sogge first saw plaintiff via the telemedicine gastroenterology (GI) clinic on November 29, 1999, after plaintiff was referred by neurologist Dr. Capozzoli for treatment for hepatitis C.  Based upon his initial consultation with plaintiff via this video conferencing system defendant Sogge recommended that plaintiff undergo a liver biopsy to determine the degree of damage to the liver caused by the hepatitis C virus.

Plaintiff was transported to the California Medical Facility (CMF) on January 7, 2000, where defendant Sogge performed the liver biopsy in person.  The tissue sample was then sent to pathologist, Dr. Barnes, who diagnosed plaintiff's liver condition as chronic hepatitis C, grade 2, stage 2.

After receiving the pathologist's report, defendant Sogge ordered interferon therapy with a first generation form of interferon known by the grade name infergen.  This therapy was continued until the full 48 week course had been completed on February 2, 2001.  As a result of this treatment, plaintiff obtained a complete response, or in other words elimination of the detectable hepatitis C virus.  Defendant Sogge therefore discontinued the interferon therapy and recommended follow-up in six months.

Prior to completion of the treatment, defendant Sogge noted that plaintiff had been experiencing ongoing peripheral neuropathy that was potentially related to his hepatitis C.

Defendant Sogge, therefore, referred plaintiff back to neurologist Dr. Capozzoli for his opinion as to the advisability of continuing the interferon therapy beyond the 48 week course as a means of controlling the neuropathic symptoms.

On December 14, 2000, Dr. Capozzoli recommended against continuing the infergen treatment for plaintiff's neuropathic symptoms.  The neurologist noted that plaintiff reported significant side effects with interferon and that, after nine months of interferon treatment, the interferon had no impact on the neuropathic symptoms.  In his opinion, interferon's significant incidence of causing paresthesia and neuropathic symptoms along with other side effects outweighed any argument for continuing it solely for the treatment of neuropathic symptoms.

In view of Dr. Capozolli's recommendation, defendant Sogge formed the impression that further treatment with interferon was not medically indicated.

Plaintiff next saw defendant Sogge via telemedicine on October 15, 2001, for the scheduled six month follow-up exam.  Defendant Sogge noted that plaintiff's viral load had rebounded (or returned to a detectable level) and reminded plaintiff that this was a known risk of treatment.  When plaintiff sought further interferon treatment, defendant Sogge reviewed Dr. Capozzoli's opinion that any side effects of a second course of interferon outweighed any benefit for plaintiff's symptoms.  When plaintiff persisted in his request for further interferon treatment, defendant Sogge agreed to a second neurology opinion from a different neurologist to assess whether re-institution of interferon would cause further nerve damage.

On February 2, 2002, plaintiff was seen by a neurologist, Dr. Hevor, for further evaluation regarding management of his neuropathy.  In his consultation report, Dr. Hevor stated that he would not recommend continued use of interferon.

Plaintiff saw defendant Sogge for the final time on April 22, 2002.  At this meeting, plaintiff requested therapy with a second generation form of interferon called Pegylated Interferon and also known by the trade name of Pegasys.  Defendant Sogge reviewed the

February 7, 2002, note of Dr. Hevor and explained that Dr. Hevor recommended against a second course of interferon treatment.  Plaintiff disagreed with defendant Sogge's interpretation of Dr. Hevor's note and stated that Dr. Hevor had verbally authorized the second generation Pegylated Interferon.  Defendant Sogge therefore recommended that plaintiff meet with Dr. Hever again.

Plaintiff met with Dr. Hevor for their second neurology consultation on June 13, 2002.  As a result of this meeting, Dr. Hevor wrote a note stating that plaintiff "describes to me a new interferon program which apparently is free of side effects.  I would recommend a trial of this preparation of interferon."

Plaintiff has not received any form of interferon treatment since February 2, 2001.  A second liver biopsy was performed on May 13, 2005, five years after the first biopsy.  This biopsy diagnoses plaintiff's current liver condition as Grade 2, Stage 1.

In support of his motion, defendant Sogge has presented the declaration of Dr. Miles Adler, an internist and gastroenterologist. This declaration is attached to defendant Sogge's summary judgment motion.

In relevant part, Dr. Adler states,

7.  It is my opinion that:

a.  All known forms of interferon therapy, including Pegylated Interferon (also known as "Pegasys"), are known to carry a risk of severe side effects such that physicians must use their clinical judgment to determine when the risks of Hepatitis C outweigh the risk of treatment.  The risks of Hepatitis C include cirrhosis of the liver and liver cancer.  However, these diseases generally take 25 to 30 years to develop after contraction of the Hepatitis C virus and only 30% of people with the virus actually develop those conditions.  Therefore, treatment with Interferon is generally not recommended for Hepatitis C patients until their liver condition has advanced to at least Grade 2 Stage 2.

****

e.  The recent biopsy indicating plaintiff's current liver condition as Grade 2 Stage 1 represents an improvement in the condition of plaintiff's liver.  The change from Stage 2 to Stage 1 indicates a reduction of the amount of fibrosis found in the liver.  The only known cause for this reduction is Interferon therapy.  Therefore, this improvement is more likely than not the result of Dr. Sogge's 2000-2001 Infergen therapy.

f. Because plaintiff's liver condition has improved to Grade 2 Stage 1, further Interferon therapy of any form, including Pegylated Interferon such as Pegasys, is not medically indicated.  The disease is not advanced to the point where the adverse risks of the disease outweigh the risks of treatment.

g.  Furthermore, patients whose viral loads relapse after initial Interferon therapy, such as plaintiff, experience a decreased chance of successful treatment with further therapy, such that the chance of successful further treatment for plaintiff with any currently known form of Interferon therapy is less than 25 percent.

h.  The recommended treatment for Hepatitis C patients, such as Mr. London, with a diagnosed liver condition of Grade 2, Stage 1 is a repeat liver biopsy in five (5) years.

i.  Dr. Sogge, as a gastroenterologist, appropriately referred plaintiff to neurologists, Dr. Capozzoli and Dr. Hevor, for treatment of plaintiff's peripheral neuropathy.

j.  Although Dr. Hevor's June 13, 2002, neurology note indicates that plaintiff described to him a side effect free form of Interferon, no currently known form of Interferon therapy, including Pegylated Interferon such as Pegasys, is side effect free.

k.  Furthermore, Pegylated Interferon, including the brand specifically demanded by plaintiff in the complaint, Pegasys, is not medically indicated for treatment of peripheral neuropathy.

Adler declaration, attached to Sogge summary judgment motion.

Defendants Dr. Williams, Dr. Douglas and Nurse Williams adopt Dr. Adler's declaration in their summary judgment motion.

In his June 1, 2006, opposition to the summary judgment motion filed by defendants Dr. Williams, Dr. Douglas and Nurse Williams, plaintiff argues that further interferon treatment is appropriate.  In other words, plaintiff disputes Dr. Adler's expert opinion.  In support of this claim, plaintiff cites exhibit 7 attached to the opposition, which is a report prepared by the National Institute of Health (NIH) following a conference in 2002 regarding the management of hepatitis C.  According to plaintiff, this report states that treatment with pegylated interferon is warranted for persons who had an initial end treatment response from interferon, but for whom this response was not sustained over time.  Plaintiff also argues that page 8 of the report indicates that interferon treatment is appropriate for persons with Grade 2, Stage 1 hepatitis.  Finally,

1    plaintiff argues that the five criteria set forth in the report for determining who should be re-

2    treated with pegylated interferon support his re-treatment.

3            The Supreme Court has held that the party opposing summary judgment need not

4    produce evidence in a form that would be admissible at trial in order to avoid summary

5    judgment.  Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.  Rather, the questions are 1) whether the

6    evidence could be submitted in admissible form and 2) "if reduced to admissible evidence would

7    it be sufficient to carry the party's burden at trial."  Id. at 327, 106 S. Ct. at 2555.

8            There are two problems with plaintiff's NIH report.  First, after reviewing this

9    report, the court finds that some medical expertise is required for its interpretation.  Plaintiff may

10   not interpret this document because he is not a medical expert.  Second, plaintiff's interpretation

11   of the report is not supported by the court's reading of this document.

12           In particular, the report does not definitely state that retreatment with pegylated

13   interferon is warranted for relapsers, i.e. patients (like plaintiff) who achieved an initial end

14   treatment response with non-pegylated interferon but for whom the response was not sustained

15   over time.  Rather, the report states that "[s]tudies are being conducted with pegylated interferon

16   and ribavarin therapy in patients who relapse after interferon monotherapy or standard interferon

17   and ribavarin therapy."  Plaintiff's Exhibit 7, NIH report, p. 16.

18           Plaintiff cites the following statement at page 8 of the NIH report as supporting

19   his claim that patients with Grade 2, Stage 1 hepatitis C should be treated with interferon: "Liver

20   biopsy can provide direct histologic assessment of liver injury due to HCV but cannot be used to

21   diagnose HCV infection."  The court does not understand how this statement demonstrates that

22   persons with Grade 2, Stage 1 hepatitis C should be treated with interferon.  Plaintiff's non-

23   expert interpretation of this report cannot be reduced to admissible evidence.

24           Finally, plaintiff argues that the five factors cited at page 16 of the NIH report for

25   determining whether a patient should be retreated with pegylated interferon support his claim for

26   retreatment.  These factors include 1) previous type of response; 2) previous therapy and the

11

1   difference in potency of the new therapy; 3) severity of the underlying liver disease; 4) viral

2   genotype and other predictive factors for response; and 5) tolerance of previous therapy and

3   adherence.  Application of the five factors to plaintiff's case require an expert opinion.  Plaintiff

4   is not a medical expert.

5          Because plaintiff has submitted no expert medical opinion to contradict the

6   statements made in Dr. Adler's declaration, the court finds the statements made in his declaration

7   to be undisputed.

8          *Analysis*

9          Defendants have presented evidence from a qualified medical expert, i.e. Dr.

10  Adler, that plaintiff was appropriately treated with standard interferon and that treatment with

11  pegylated interferon or pegylated interferon combined with ribavarin is not medically warranted.

12  Plaintiff has presented no expert evidence disputing defendants' evidence.  For these reasons, the

13  court does not find that defendants acted with deliberate indifference by failing to treat plaintiff's

14  hepatitis C with pegylated interferon or pegylated interferon combined with ribavarin.

15         Plaintiff also argues that defendant Nurse Williams made a false entry in his

16  medical records that his drug abuse screen was positive, thereby precluding plaintiff from further

17  interferon treatment.  In his June 1, 2006, declaration filed in support of his opposition, plaintiff

18  states that prior to filing his complaint, he saw this entry in his medical records.  Plaintiff's

19  Declaration, ¶ 11.  Plaintiff concedes that this entry is no longer in his medical files.  Id.  Because

20  this claim against defendant Nurse Williams is not supported by the evidence, the court

21  recommends that defendant be granted summary judgment as to this claim.

22         B.  Retaliation

23         Plaintiff alleges that defendants retaliated against him for filing administrative

24  grievances by denying his requests for pegylated interferon or pegylated interferon combined

25  with ribavarin.

26  /////

12

1          In order to succeed on a claim of retaliation, plaintiff must demonstrate five

2   elements: 1) an assertion that a state actor took some adverse action against him 2) because of 3)

3   the prisoner's protected conduct, and that such action, 4) chilled the inmates's exercise of his

4   First Amendment rights, and 5) the action did not reasonably advance a legitimate correctional

5   goal.  Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005).  If the prisoner does not allege a

6   chilling effect, allegations that he suffered more than minimal harm will almost always have a

7   chilling affect.  Id., no. 11.

8          The adverse action alleged by plaintiff in support of his retaliation claim is the

9   denial of pegylated interferon or pegylated interferon combined with ribavarin.  As discussed

10  above, plaintiff's treatment with pegylated interferon was not medically warranted.  Accordingly,

11  the court recommends that defendants be granted summary judgment as to plaintiff's retaliation

12  claim because he has not demonstrated that defendants took an adverse action against him.

13                  C.  Due Process

14         Plaintiff argues that defendants violated his right to due process by not correctly

15  processing his administrative appeals.  Because inmates lack a separate constitutional entitlement

16  to a specific prison grievance procedure, defendants should be granted summary judgment as to

17  this claim.  Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003); Mann v. Adams, 855 F.2d 639,

18  640 (9th Cir. 1988)("[t]here is no legitimate claim of entitlement to a grievance procedure.").

19         Accordingly, IT IS HEREBY RECOMMENDED that:

20         1.  Defendant Sogge's summary judgment motion filed April 5, 2006, be granted;

21         2.  The summary judgment motion filed April 28, 2006, by defendants Dr.

22  Williams, Nurse Williams and Dr. Douglas be granted;

23         3.  All defendants be granted summary judgment sua sponte as to plaintiff's

24  retaliation and due process claims.

25         These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

1   days after being served with these findings and recommendations, any party may file written

2   objections with the court and serve a copy on all parties.  Such a document should be captioned

3   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

4   shall be served and filed within ten days after service of the objections.  The parties are advised

5   that failure to file objections within the specified time may waive the right to appeal the District

6   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

7   DATED: 2/13/07

                                                /s/ Gregory G. Hollows
8                                               _____
9                                               GREGORY G. HOLLOWS
                                                UNITED STATES MAGISTRATE JUDGE
10
    lon67.sj
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26